Eileen CAVANAUGH, Plaintiff,

v.

SOUTHERN CALIFORNIA PERMANENTE MEDICAL GROUP, INC., et al., Defendants.

No. CV 06–4930–GW (JTLx).

United States District Court, C.D. California.

Sept. 10, 2008.

Frank A. Magnanimo, I. Benjamin Blady, Appleton Blady and Magnanimo LLP, Los Angeles, CA, for Plaintiff.

Dean A. Martoccia, Jennifer N. Sloane, Thomas R. Kaufman, Seyfarth Shaw, Los Angeles, CA, for Defendants.

## STATEMENT OF REASONS Re RULINGS ON MOTIONS FOR SUMMARY JUDGMENT

GEORGE H. WU, District Judge.

### I. *INTRODUCTION*

Plaintiff Eileen Cavanaugh ("Plaintiff"), a certified registered nurse anesthetist ("CRNA"), employed by defendant Southern California Permanent Medical Group ("SCPMC"), reported to work on June 22, 2005, apparently in an inebriated state. As a result of that incident, Plaintiff and SCPMC entered into a "Last Chance Chemical Dependency Rehabilitation Agreement" which required Plaintiff *inter alia* to enroll in and complete a "chemical

dependency recovery program." Plaintiff purportedly failed to complete such a program and was terminated. During the relevant period, Plaintiff was a member of and represented by a union, *i.e.*, defendant Kaiser Permanente Nurse Anesthetists Association ("KPNAA"). The KPNAA filed a grievance on Plaintiff's behalf but did not seek to arbitrate the matter.

In her First Amended Complaint ("FAC"), Plaintiff alleges causes of action for: 1) violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, 2) breach of employment contract, 3) breach of duty of fair representation against the KPNAA under 29 U.S.C. § 185 *et seq.*,[1] 4) breach of the implied covenant of good faith and fair dealing, and 5) failure to pay statutorily mandated wages under the Federal Fair Labor Standards Act ("FLSA").

Both sides have moved for summary judgment or in the alternative for partial summary judgment. After considering the moving, opposition, reply and supplemental briefs, the concomitant declarations and exhibits, the materials in the case file, and the oral arguments at the hearing, this Court grants Defendants' motion and denies Plaintiff's motion for the reasons stated herein and at the hearing.

## II. *FACTUAL BACKGROUND*

### A. *Plaintiff's Employment as a CRNA*

Plaintiff began her employment as a CRNA at SCPMC's Kaiser Permanente Hospital on Sunset Boulevard ("Sunset Facility") on or about July 25, 2001.[2] *See* FAC at ¶ 7; Fact No. 1 in Plaintiff Eileen Cavanaugh's Separate Statement of Genuine Issues of Material Fact in Opposition to Defendant Southern California Permanente Medical Group and Jeffrey A. Weisz, M.D., et al.'s Motion for Summary Judgment ("PSSGI")[3]; Volume I of Deposition of Eileen Cavanaugh 129:8–13, attached as Exhibit R at page 303 to Defendants' Appendix of Evidence, Volumes One and Two in Support of the Motion for Summary Judgment filed on July 11, 2007 ("7/11/07 Defendants' Appendix of Evidence"). At

---

**1.** On or about June 19, 2007, pursuant to a stipulation of the parties, the KPNAA was dismissed from this lawsuit. *See* Docket Item No. 30.

**2.** Defendant SCPMC is identified as "a partnership" in the caption of the FAC and as Plaintiff's employer in paragraph 7 therein. "Jeffrey A. Weisz, M.D. et al." is also sued as a defendant in the FAC because that entity is named as Plaintiff's employer in her 2005 W–2 form issued by SCPMC. *See* FAC at ¶ 7; *also* Exhibit J, page 78 in Defendants' Appendix of Exhibits filed on July 11, 2007.

**3.** In her PSSGI, Plaintiff often responds to one of "Defendant's Alleged Uncontroverted Facts" by: 1) controverting the fact "in part" by raising a contention which does not disestablish or rebut its essential factual premise and/or by referencing digressive materials, and/or 2) indicating that the fact is "controverted" but either failing to provide any admissible evidentiary material to support her

position or responding with assertions which are not significantly related to the original factual contention. Where this Court has cited to a factual item in the PSSGI that Plaintiff has "controverted" in whole or in part, it has done so because it has concluded that Plaintiff's response to the fact is insufficient to create a material issue of disputed fact. *See S.A. Empresa, etc. v. Walter Kidde & Co., Inc.,* 690 F.2d 1235, 1238 (9th Cir.1982) ("... a party cannot manufacture a genuine issue of essential fact merely by making assertions in its legal memoranda.").

Conversely, as to certain of their "Alleged Uncontroverted Facts," Defendants' evidentiary citations either do not (or are insufficient to) establish the purported fact, or are sufficiently controverted by Plaintiff's responsive evidentiary showing. However, where Defendants' deficiency goes only to part of the fact or facts referenced, this Court will cite to the item in the PSSGI to the extent that there is an undisputed fact therein.

all relevant times, Plaintiff was represented by the KPNAA union. PSSGI, Fact No. 3. As a union member, Plaintiff's employment was governed by the "Labor Agreement between Kaiser Permanente Nurse Anesthetist Association of Southern California and Southern California Permanente Medical Group" ("Labor Agreement"). *Id.* Fact No. 4.

In California, a CRNA is a registered nurse who has received additional training and has been certified to provide anesthesia services. *See generally* the "Nurse Anesthetists Act", California Business and Professions Code §§ 2825 *et seq.* As noted in *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1407 (9th Cir.1991): "CRNAs are licensed to perform many of the same anesthesia services as physician anesthesia providers.... The physician providers have a medical degree and are trained to perform certain complicated procedures that nurse providers cannot perform."[4]

As to her duties and functions as a CRNA at the SCPMC's Sunset Facility, Plaintiff has testified as follows.[5] CRNAs perform tasks which regular registered nurses are not trained or allowed to do—such as apply anesthesia, intubate a patient, and/or administer a spinal or epidural block. *See* Volume 2 of March 15, 2007 Deposition of Eileen Cavanaugh ("Vol. 2 Plaintiff's 3/15/07 Depo.") at 278:19–279:12, attached as Exhibit S to 7/11/07 Defen-

---

4. As stated in the Kaiser Permanente–Los Angeles Medical Center Policies and Procedures, the job description for a CRNA is as follows:

 *BASIC FUNCTIONS*

 Performs anesthetic management of patients undergoing surgical procedures, to include airway management, maintenance of fluid balance, homeostasis, monitoring. In addition, assistance in cardiopulmonary resuscitation, and direction of maintenance of ventilators for respiratory adequacy.

 *SUPERVISION RECEIVED AND EXERCISED*

 1. Under the supervision of C.R.N.A. Supervisor and Chief, Department of Anesthesiology.

 2. Receives supervision on individual cases from staff anesthesiologist or surgeon in the absence of an anesthesiologist.

 *DUTIES*

 1. Inserts intravenous needle or catheter and maintains fluid balance preoperatively, intra-operatively, and immediately post-operatively.

 2. Performs endotracheal intubation for induction and maintenance of anesthesia or airway management in all medical functional units.

 3. Administers anesthesia by intravenous injection, gas inhalation, or a combination of the two, administers and/or monitors regional blocks, maintaining safe levels during the surgery according to the patient's surgical needs, under the supervision of the anesthesiologists.

 4. Maintains accurate and complete anesthesia record on patient during entire procedure. Any changes in staff will be documented. The supervising anesthesiologist's name will be included on the anesthesia record and any change in supervision will also be documented.

 5. Administers for homeostasis, fluids blood, and blood products in consultation with a physician.

 6. Directs position changes to avoid external pressure and nerve damage.

 7. Performs pre-operative evaluation of the patient, reviews the medical history, and reviews the patient's chart. Consults with the anesthesiologist or the surgeon for advice when "high risk" factors are evident in the medical history.

 *See* pages 683–84 of Volume 3 of Appendix of Evidence of Second Amended Declaration of I. Benjamin Blady in Support of Plaintiff Eileen Cavanaugh's Motion for Summary Judgment, filed on July 27, 2007.

5. Plaintiff's deposition testimony on this topic was specifically referenced in Defendants' Statement of Uncontroverted Facts and Conclusions of Law. Plaintiff in her PSSGI does not withdraw, attempt to change or otherwise indicate that her testimony on this subject was false or incorrect. Nor has she proffered any evidence which contradicts that testimony.

dants' Appendix of Evidence at pages 325–26.[6] Plaintiff's "typical routine ... on a given workday" (*see id.* 280:5–6) would begin with an initial set-up of equipment/materials, then going to the patient and interviewing him or her, reviewing the medical chart, learning what drugs the patient has already been given, and determining the nature of the patient's medical situation. *Id.* at 283:5–13. The patient is then taken to the operating room. The CRNA never begins without the anesthesiologist being present. *Id.* at 283:15–17. A discussion is held between the anesthesiologist and the CRNA, the length and nature varying with the experience and relationship of the participants.[7] *Id.* at 284:2–15. After anesthesia is given and the operation begun, the anesthesiologist (who may have a number of patients to see) may leave the operating room, which means that there can be lengthy stretches of time where there is no anesthesiologist present and only the CRNA remains to monitor and/or adminis-

ter the anesthesia. *Id.* at 291:17–292:10. The anesthesiologist may return every two or three hours and remain for a few minutes to check up on the patient and the CRNA. *Id.* at 291:13–21. If there was a problem while the anesthesiologist is absent from the operating room, the CRNA would "page" the anesthesiologist to return, but the CRNA would have to resolve the immediate situation because the patient could die in the interim. *Id.* at 293:9–295:12. During the entire surgery, the CRNA has to monitor the patient's condition for problems that could develop regarding oxygen level, fluid level, heart rate, or in response to events occurring during the surgery such as the surgeon hitting a vessel or an equipment system becoming disconnected. *Id.* at 292:3–293:8. In performing their duties, CRNAs utilize monitoring equipment but also have to employ their training and experience to correctly interpret the data from the machines.[8] *Id.* at 298:1–305:17. When the

---

6. Plaintiff noted that there are three years of additional training for a registered nurse to learn the additional CRNA functions. Vol. 2 of Plaintiff's 3/15/07 Depo. at 279:4–12, 307:21–308:5 and 350:3–9, attached as Exhibit S to 7/11/07 Defendants' Appendix of Evidence.

7. As stated by Plaintiff:
 ... it's a highly variable situation. I mean, you know, because—you know, if he thinks you have good judgment, you know, he'll shut up, you know what I mean, he'll let you do your thing. But, you know, I've seen—you know, after 35 years of this I'm sort of like, okay, whatever you want, just tell me what you want, as long as it doesn't harm the patient. I don't get into those, you know, I want to do it my way. It's ridiculous. So as long as it doesn't harm the patient my attitude is if you're good you should be able to do it the way he's telling you, why are you forcing your opinion. But, you know, so there would be some dialogue.
 *Id.* at 284:2–15
 Further, if a CRNA believed that an anesthesiologist's direction or order violated one

of the SCPMC's written standard of care policies, the CRNA could refuse to implement it. PSSGI Fact No. 18.

8. As Plaintiff testified:
 There's no machine that says okay. I mean, it reads a number, so, yes, your professional judgment you have to know what the number means.
 *Id.* at 299:15–18.
 But the bottom line is you never put your best judgment on a machine, because they fail. So it's only like a guideline. If the patient is blue and your saturation's 100, well, you know you're not going to stand there and go, well, it says 100. Like da.
 *Id.* at 300:9–13.
 If somebody is walking around with, really, hypertension, you know, you cannot drop them down in anesthesia to, you know, a normal blood pressure. They'll stroke. I mean, yes, there's all kinds of judgment calls like that.
 *Id.* at 302:20–24.
 Q. Do you draw on your expertise as a CRNA when you're monitoring a patient to determine that their fluid levels are appropriate?

surgery nears completion, the CRNAs must use their judgment and expertise as to when to slow down and/or turn off the anesthesia. *Id.* at 310:23–311:14.

"Article VIII–Hours of Work" in the Labor Agreement provides in part as follows:

802 The parties recognize the Professional nature of work performed by employees covered by this Agreement. While each full-time employee will be scheduled to work an average of eighty (80) hours biweekly, the actual daily and weekly work schedule may vary due to time requirements or specific assignments and seasonal variations in work load. The Employer agrees to provide full-time employees eighty (80) hours of pay on a biweekly basis. However, if an employee is off work on a non-compensated employee initiated absence, the employee is not guaranteed eighty (80) hours of pay. The scheduling of hours during the week shall be established by the Chief of Service, or designee. The CRNA schedule will be facility specific. * * * *

803 Where conditions require that a CRNA work beyond his or her scheduled hours, the CRNA will perform such required services without additional compensation. Conversely, where the duties of any CRNA are not required, such CRNA will be released from duty. The Employer will make every reasonable effort to provide staffing which is adequate for the expected work load.

804 Should a full-time CRNA accept a work assignment to begin prior to the start of his/her normal shift which results in the CRNA working hours additional to his/her normal scheduled

shirt, or should a CRNA accept the assignment of additional hours (following the completion of all work contemplated in the first sentence of Paragraph 803 and/or Paragraph 2010) all such additional hours shall be paid at the CRNAs regular straight time hourly rate.

*See* page 403 of 7/11/07 Defendants' Appendix of Evidence. Effective October 2, 2004, CRNAs were paid a minimum of $9,244 per month which equals $2,133.23 per week. *Id.* at page 422.

Under the Labor Agreement, CRNAs can elect to participate in an Alternative Compensation Plan ("ACP") where the CRNA would receive a 20% increase in salary in lieu of certain benefits and premium/differentials such as sick leave pay and paid time off. *Id.* at page 423; PSSGI Fact No. 22. During the relevant times herein, Plaintiff participated in the ACP. PSSGI Fact No. 23.

**B. *The June 22, 2005 Incident and Its Aftermath***

On June 22, 2005 at about 5:00 p.m. Plaintiff arrived at the anesthesia lounge to relieve co-worker Darrel Nooner. PSSGI Fact No. 25. Plaintiff appeared to Nooner to be slurring her speech, had a "very glazed look about her," and when standing, she was "weaving around." *See* Statement attached to Declaration of Darrel Nooner, Exhibit A to 7/11/07 Defendants' Appendix of Evidence at page 8. Nooner contacted Dr. Donald Marcus. *Id.* Dr. Marcus contacted CRNA Janice Groschen (a union steward) and Dr. Roy Bragnza to meet at his office to determine Plaintiff's condition. *See* Statements attached to Declaration of Dr. Donald Marcus, Exhibits E and F to 7/11/06 Defen-

A. Oh, yes.
Q. And that's something you're doing all the time?

A. All the time.
*Id.* at 305:11–17.

dant's Appendix of Evidence at pages 21 and 22. When Plaintiff arrived at his office at about 5:20 p.m., Dr. Marcus observed that her speech was incoherent, she knocked over items on his desk when she attempted to sit down, and the odor of alcohol was very strong on her breath. *Id.* Those manifestations were also observed by Groschen.[9] *See* Exhibit C to 7/11/07 Defendants' Appendix of Evidence, and Statement attached to Declaration of Dr. Roy Bragnza, Exhibit B to 7/11/07 Defendants' Appendix of Evidence. Plaintiff's blood was drawn and the blood/alcohol level "came back quite high." *See* Exhibit F, *Id.* at page 22.

On June 23, 2005, Jim Huber (the SCPMG Anesthesia Department Administrator) sent Plaintiff a letter indicating that she would be placed on paid administrative leave while the events of June 22nd were investigated. PSSGI Fact No. 39. Subsequently, a meeting was held with Plaintiff, Huber, Brian Herzberger (Assistant Department Administrator), Sandra Even (Plaintiff's union representative), and Debra Hammons (from SCPMC's Human Resources Department). PSSGI Fact No. 41. Plaintiff was informed that her actions on the evening in question were sufficient to warrant immediate termination of her employment, but that such termination would be withheld if she availed herself of the Employee Assistance Program ("EAP") and successfully completed the "proscribed [sic] substance abuse treatment program." *See* Declaration of Brian Herzberger and Exhibit O attached to 7/11/07 Defendants' Appendix of Evidence at pages 280–83; *also* PSSGI Fact No. 43. During the period between June 23 and July 8, Plaintiff did not tell the KPNAA that she wanted a grievance filed or any other action taken on her behalf. *See* PSSGI Fact No. 48.

On July 8, 2005, Plaintiff and the SCPMC entered into a "Last Chance Chemical Dependency Rehabilitation Agreement" ("LCA"), which was signed by Plaintiff, Huber, Hammons, and Even (as the "Union Business Representative"). *See* 7/11/07 Defendant's Appendix of Evidence Exhibit P; PSSGI Fact No. 51. Plaintiff indicated that she understood the terms of the LCA and was given a copy of it. PSSGI Fact Nos. 50 and 52. The LCA states in part:

B. The Employee admits that she is alcohol and/or drug dependent and that such dependency has adversely affected her job performance or conduct in the workplace.

C. The Employee desires to obtain treatment for her drug and/or alcohol dependency, and the Employer recognizes that drug and/or alcohol dependency is a behavioral/medical disorder that is responsive to treatment.

D. Because of the Employee's admission as described above, the parties recognize that total abstinence from alcohol and drugs by the Employee is required for effective recovery and for retention of employment with the Employer.

1. The Employer agrees that it will reduce the level of corrective action, which would have resulted in a Level 5 termination of the Employee, to a Level 4 Last Chance Agreement with no Day

---

9. In Volume 2 of Plaintiff's 3/15/07 Deposition, in regards to the reports by Nooner, Groschen, Marcus and Bragnza concerning her slurred speech, difficulty in maintaining her balance and other physical manifestations, Plaintiff testified that she didn't recall exhibiting such manifestations but conceded that "... that's what they saw." *See e.g.,* 7/11/07 Defendants' Appendix of Evidence at Exhibit S at pages 370–71. Likewise, Plaintiff testified that she didn't have any reason "to dispute" or "not to dispute" that her blood alcohol level was .2 when tested on June 22, 2005. *Id.* at page 369–70.

of Decision. The corrective action will remain in effect during the term of this Agreement. The Employee agrees that the facts alleged in the Level 5 are true, and she waives any right to file a grievance concerning those facts or discipline.

2. The Employee will present the Employer with documentation that she has enrolled in a chemical dependency recovery program. If the Employee has Kaiser Foundation Health Plan benefits, treatment must be obtained in a Kaiser Permanente program or in a Kaiser Permanente approved external program. If the Employee is not covered by the Health Plan, she must enroll in a Kaiser Permanente approved external program. Prior to enrolling in any external program the employee must obtain written approval from the Employee Assistance Program. The Employee will not be permitted to return to work until she provides documentation to the Employer that she has completed the first phase of a recovery program as determined by the chemical dependency recovery program administrator. * * * *

3. The Employer understands that the Employee may need a medical leave of absence to complete the first phase of a recovery program. Said medical leave of absence will be granted, if the Employee is otherwise eligible, upon the certification of a physician and must begin no later than July 18, 2005. The medical leave of absence will be subject to the same terms and conditions of any other medical leave of absence. If a medical leave of absence is granted, the Employee will submit an appropriate written release to return to work prior to the concluding date of the medical leave of absence.

\* \* \*

5. When enrolling in the recovery program and thereafter, the Employee will acknowledge to appropriate recovery program staff that she is alcohol and/or drug dependent and desires treatment for such. Refusal to do so will constitute noncompliance with this Agreement and will subject the Employee to discharge.

6. After enrolling in the recovery program, the Employee will: 1) attend and participate in all program services as outlined in the employee's individual treatment plan; 2) abstain from all alcohol and drug use[;] 3) refrain from any conduct that would result in the employee's rejection or dismissal from the program; and 4) comply with all other terms and conditions of the program. The Employee will, each month or on a more frequent basis if required, present written documentation to the Employer that she is complying with the foregoing.

\* \* \*

10. The Employee understands and agrees that her continued employment is contingent with all of the above terms of this Agreement, and that her failure to do so will result in immediate termination of employment with Southern California Permanente Medical Group. The employee also understands and agrees that she will have no recourse to any grievance and arbitration procedure, if applicable, with regard to any discharge or other discipline imposed pursuant to the terms of this Agreement.

On July 11, 2005, Plaintiff began treatment at the Chemical Dependency Recovery Program ("CDRP") in the Day Treatment Program which is an intensive 14 day outpatient regimen. PSSGI Fact Nos. 54 and 55. After three days in Day Treatment, Plaintiff was moved to the Engagement Group which was a less stringent program. *Id.* Fact No. 57.

In correspondence dated July 19, 2005 to Dr. S. Radparvar who was the "Chief of Service" in regards to her treatment,

Plaintiff wrote expressing her disappointment with the Engagement Group therapy.[10] *See* Exhibit DD to 7/11/07 Defendants' Appendix of Evidence at page 793. She also indicated that Fatemeh Farahan (one of the members of Plaintiff s treatment team) told her at the time of the move from the Day Treatment program to Engagement Group that she would be allowed to go back to work; but that Farahan and Mark Montijo (an EAP counselor) had later informed her that " 'they' no longer feel I can go back to work 'for sometime.' " *Id.* at page 794.

In response to that letter, a meeting was held with Plaintiff, Dr. Radparvar, Farahan, Montijo and Sally Ann Cross (a Clinical Program Manager and Assistant Department Administrator of the CDRP). PSSGI Fact No. 62. At the meeting, Plaintiff was encouraged to continue treatment with the CDRP but she was also informed that she could apply to the Board of Registered Nursing ("BRN") Diversion program. *Id.* Fact No. 63; *see also* Deposition of Dr. S. Radparvar, Exhibit CC to 7/11/07 Defendant's Appendix of Exhibits at pages 736–40.

On August 12, 2005, Plaintiff contacted the BRN to apply to its program. PSSGI Fact No. 67. At that time, while Plaintiff told Farahan that she had made a call to the BRN, Plaintiff did not tell Farahan

that she had in fact applied to the BRN program. *Id.* Fact No. 68.

Plaintiff stopped coming to treatment at the CDRP on or about August 24, 2005. PSSGI Fact No. 69. She admits that she did not complete the CDRP program (*see* Vol. III of Plaintiff's 3/16/07 Depo. 674:25–675:8, attached as Exhibit T to 7/11/07 Defendants' Appendix of Evidence at pages 482–83); nor did she receive a certificate of completion (*Id.* 684: 5–7, Exhibit T at page 486).[11] At that point, Plaintiff was not enrolled in or attending any other treatment program. PSSGI Fact No. 70. On August 29, 2005, Farahan sent a letter to Montijo stating in part: "Eileen was given the option of either informing the nursing board to enter a diversion program or was to continue with the CDRP outpatient program. Pt was seen last on August 24, 2005 and declined both options." Exhibit DD, 07/11/07 Defendants' Appendix of Evidence at page 783.

On August 29, 2005, Montijo sent an inter-office memorandum to the Supervisor of Human Resources indicating that:

> It has been verified that for a period of 07/08/05 to 08/23/05, *Eileen Cavanaugh* demonstrated satisfactory compliance with the recommended treatment plan. On 08/24/05, Eileen Cavanaugh failed to comply with the recommendations of the treatment program. As of this date, Ms. Cavanaugh has remained in a non-

---

**10.** Plaintiff stated in part:
> I have given this very serious consideration—there is NO WAY I can sit home starring [sic] at the four walls and wait for my 4.5 hours of group each week. This is nonsense!

Exhibit DD in 7/11/07 Defendants' Appendix of Evidence at page 794.

**11.** Plaintiff claims she was given a choice of either continuing with the CDRP or going to the BRN program and she elected the latter. *See* Plaintiff's Response in Opposition to Defendant's Alleged Undisputed Fact No. 69

contained in PSSGI at pages 107–08. Plaintiff has not presented any evidence that, during the relevant time herein, she was admitted into the BRN Diversion program or so informed the SCPMC. There is evidence in Montijo's file concerning Plaintiff that the BRN indicated as of September 16, 2005, that Plaintiff was merely an "Applicant" in regard to the Diversion program and her first "pre-Diversion Evaluation Committee" meeting was scheduled for October 20, 2005. *See* Exhibit DD, attached to 7/11/07 Defendant's Appendix of Evidence at page 779.

compliance status with treatment recommendations.

*Id.* at page 782.

On September 1, 2005, a meeting was held with Plaintiff regarding her enrollment in a treatment program. PSSGI Fact No. 72. Attending the meeting were Huber, Even, Montijo, Hammons and Herzberger. *Id.* Plaintiff was asked if she was enrolled in a treatment program and she admitted that she was not.[12] *Id.* Fact No. 73; *see also* Vol. 3 of Plaintiff's 3/16/07 Depo. 705:5–7, Exhibit T to 07/11/07 Defendants' Appendix of Evidence at page 705. At the end of the meeting, Plaintiff was terminated.[13] PSSGI Fact No. 75.

After the September 1, 2005 meeting, Even stayed behind to fill out a grievance form for Plaintiff to challenge her termination. PSSGI Fact No. 76. A "Step Two" grievance meeting was held on September 22, 2005. PSSGI Fact No. 79. On September 30, 2005, Hammons wrote to Even denying plaintiff's grievance stating in part:

It is the position of the Employer that Grievant violated her Last Chance Agreement. On September 1, 2005 there was an investigatory meeting during which Brian Herzberger asked Grievant if she was currently enrolled in a treatment program. Grievant responded, "No." Based upon Grievant's admission that she was not currently enrolled in a treatment program, the

Employer concluded that Grievant was in violation of paragraph D2 and D6 of the Last Chance Agreement.

During the grievance meeting, Grievant was asked why, during the investigatory meeting, she failed to share that she had contacted the BRN. Grievant responded that she was surprised by the questions being asked at the meeting and that it was clear to her that Management had an agenda. Grievant asserted that it was Management's obligation to ascertain why she was no longer in compliance with the treatment program requirements and that Management should have asked if she had sought to enroll in a different program. Grievant also stated that her current status with the California Diversion Program is applicant. Consistent with the statement made in [the BRN Project Manager's September 16, 2005] letter, Grievant will not be considered a participant in the program unless and until the Diversion Evaluation Committee accepts her into the program.

Grievant, as a party to the Last Chance Agreement dated July 8, 2005, was responsible for compliance with the terms of the agreement. When Grievant chose to discontinue her participation in the chemical dependency recovery program, she violated the terms of the agreement. Although Grievant took steps to enroll in

**12.** Plaintiff notes that there is evidence that, at the September 1 meeting, she stated that she had "chosen" the BRN program. *See* Response in Opposition to Fact No. 73 in PSSGI; *also* Huber Deposition 206:21–207:12 attached as Exhibit P to Volume 5 of Amended Declaration of I. Benjamin Blady at pages 992–93.

**13.** In the record are two notices of "Corrective Action Process—Level 5: Termination" signed and dated September 1, 2005 by Huber and Even, and signed but not dated by Plaintiff. The first notice gives the reason for

termination as resting on Plaintiffs reporting to work on June 22, 2005 in an inebriated state and her failure to respond to a code pager on that date in violation of a "Last Chance Agreement on October 20, 2004." *See* Exhibit T, 07/11/07 Defendants' Appendix of Evidence at page 499. The second notice gives the following explanation: "On August 24, 2005 you failed to comply with the terms of your Last Chance Agreement when you were no longer attending and participating in all program services in accordance with your chemical dependency recovery program." *Id.* at page 500.

the California Diversion Program, she did not obtain written approval from the Employee Assistance Coordinator as required by paragraph D2 on page 2 of the agreement. She violated paragraph D6 when she stopped attending sessions at the chemical dependency recovery program on August 24, 2005, prior to the conclusion of her individual treatment plan. A more appropriate course of action for the Grievant to have taken would have been for Grievant to remain in the chemical dependency recovery program, obtain written approval from the Employee Assistance Coordinator to participate in the California Diversion Program, then once accepted into the diversion program, Grievant could have, with approval, discontinued her treatment with the chemical dependency recovery program. This way Grievant would have at all times been in a treatment program and there would have been no lapses in her treatment.

Exhibit U to 07/11/07 Defendants' Appendix of Evidence at page 562.

KPNAA filed a "Step Three" grievance on behalf of Plaintiff and a meeting was held on November 7, 2005. PSSGI Fact No. 83. On November 8, 2005, the Step Three grievance was denied. *Id.* Fact No. 87. In the denial letter, it was stated that:

The Union is protesting her termination claiming that in fact that the grievant was not in the Employer's substance rehabilitation program on the advice of the Employer's representatives. She was told that she would be better served if she was enrolled in the Board of Registered Nursing (BRN) program rather than the Kaiser Permanente Program. She chose to go enroll in the BRN program and applied on August 12, 2005. The Union furnished a document from the BRN which indicated that the grievant was not appropriate for the program. Thus, according to the Union[,] the grievant did not violate the Employ-

er's Last Chance Agreement and discharge is unwarranted.

Based on the Employer's documentation there is not [sic] doubt that the grievant was not in compliance with the Last Chance Agreement. She was given an option to remain in the Employer's program or enroll in the BRN program. The Employer's records indicate that she chose neither. She has since produced documentation that she attempted to enroll in the BRN program, which indicates that she is not an appropriate candidate. Thus, according to the BRN's evaluation[,] the grievant does not have a [sic] problem that she claims she had when she signed the Employer's Last Chance Agreement.

The grievant's behavior on June 22, 2005 would have resulted in discharge. However, it was mitigated by the Employer because she claimed that she had a substance abuse problem. As such she was placed on a Last Chance Agreement and was to comply with all its provisions. She failed to do so. Furthermore, it appears that she has misrepresented her condition and she is not eligible for rehabilitation according to the BRN. It is the Employer's position that the discharge was appropriate.

*See* Exhibit N to 7/11/07 Defendants' Appendix of Evidence at pages 278–79.

In January 2006, the KPNAA notified Plaintiff that it had decided not to proceed to arbitration in her matter as provided in Section 5 of the Labor Agreement. PSSGI Fact Nos. 88–89. Plaintiff filed an unfair labor practice charge with the National Labor Relations Board ("NLRB") against the KPNAA for failing to seek arbitration as to her grievance with the SCPMC. *Id.* Fact No. 90. On March 22, 2006, the NLRB issued a "Regional Decision" dismissing the charge and stating that:

On September 1, 2005, the hospital discharged you for failing to comply with the terms of the LCA. On September 2, 2005, the Union filed a grievance protesting the hospital's decision and began investigating the matter. As a result of the Union's investigation, it determined that your conduct constituted a number of violations of the LCA, and that as a result, it would be unsuccessful if your case was pursued in arbitration. Even though you disagree with the Union's evaluation of your case, the evidence is insufficient that the Union's decision was motivated by any consideration that is unlawful under the National Labor Relations Act.

It [is] well settled that in the interest of effectively administering a contract's grievance-arbitration machinery, a union must be allowed a wide range of discretion in screening out, settling, or abandoning short of arbitration, grievances which it in good faith believes does not justify proceeding through that costly and time-consuming final step. *Local 575, Packinghouse Division, Amalgamated Meat Cutters and Butcher Workmen (UPWA), AFL–CIO (Omaha Packing Company)*, 206 NLRB 576, 1973 WL 4522 (1973); *cf. Ford Motor Co. v. Huffman*, 345 U.S. 330, 337–338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). An employee does not have an absolute right to have his grievance taken to arbitration, and no inference of unfair representation may be drawn merely from a bargaining agent's refusal to press a grievance case through the ultimate stage of the contract's grievance procedures, or, for that matter, through any intermediate stage. And this, it has been held, is so even though it appears that the union may have acted negligently or exercised poor judgment in its handling of a grievance. *Bazarte v. United Transportation Union*, 429 F.2d 868, 872 (3d Cir.1970). "A breach of the statutory duty of [fair]

representation," the Supreme Court has made clear, "occurs only when a union's conduct toward a member of the collective-bargaining unit is arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

*See* Exhibit U, 7/11/07 Defendants' Appendix of Evidence at page 567.

### III. DISCUSSION

#### A. Summary Judgment Standards

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Miranda v. City of Cornelius*, 429 F.3d 858, 860 n. 1 (9th Cir.2005). A moving party with the burden of persuasion at trial must establish "beyond controversy every essential element of its" claim or defense. *See Southern Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir.2003). A moving party without the burden of persuasion may carry its burden of production on summary judgment by negating an essential element of the opposing party's claim or defense or by "showing" the opposing party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial. *See Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir.2000).

If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); [additional citation omitted], the nonmoving party may not

rely on the mere allegations in the pleadings in order to preclude summary judgment. [Citation omitted.] Instead, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, *"specific facts* showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e) (emphasis added). . . .

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987). When parties file cross-motions for summary judgment, the Court must consider the evidence submitted in support of both motions before ruling on either motion. *See Fair Housing Council of Riverside County, Inc. v. Riverside Two,* 249 F.3d 1132, 1136 (9th Cir.2001).

In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and views all evidence and draws all inferences in the light most favorable to the non-moving party. *See T.W. Elec.,* 809 F.2d at 630–31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Motley v. Parks,* 432 F.3d 1072, 1075 n. 1 (9th Cir.2005) *(en banc); Miranda,* 429 F.3d at 860 n. 1. The evidence presented by the parties must be admissible. *See* Fed.R.Civ.P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

"A party claiming relief may move . . . for summary judgment on all or part of the claim." Fed.R.Civ.P. 56(a). "[T]o the extent practicable," a court "should . . . determine what material facts are not genuinely at issue" and issue an order "specifying what facts—including items of damages or other relief—are not genuinely at issue." *See* Fed.R.Civ.P. 56(d).

## B. *The FMLA Claim*

### 1. *Applicable Law*

"The FMLA creates two interrelated, substantive employee rights: first, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave. 29 U.S.C. §§ 2612(a), 2614(a)." *Bachelder v. America West Airlines, Inc.,* 259 F.3d 1112, 1122 (9th Cir.2001). 29 U.S.C. § 2615(a)(1) states: "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." In the implementing regulations, it is provided that "... employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions. ..." 29 C.F.R. § 825.220(c).

In her FAC, Plaintiff bases her FMLA claim on the following five purported, violations:

a. Failing to give proper and/or timely notice of designation of Plaintiff's leave as FMLA leave and/or retroactively designated her leave in violation of 29 CFR § 825.208;

b. Failing to provide timely and/or adequate written notice detailing its notice requirements, in violation of 29 CFR § 825.301;

c. Interfering with Plaintiff's right to return from leave, in violation of 29 U.S.C. § 2615(a)(1);

d. Discriminating and retaliating against Plaintiff for taking protected leave, including terminating Plaintiffs employment, in violation of 29 U.S.C. § 2615(a)(2); and

e. Not allowing Plaintiff the entire permitted leave time, and terminating

her employment while on leave, in violation of 29 U.S.C. § 2615(a)(1) and 29 U.S.C. § 2615(a)(2).

*See* FAC at ¶ 94.[14] Plaintiff's FMLA claim falls within 29 U.S.C. § 2915(a)(1)'s prohibition against *interference* with FMLA rights as opposed to the "anti-retaliation" or "anti-discrimination" prohibition in 29 U.S.C. § 2915(a)(2). *See Bachelder,* 259 F.3d at 1124. Consequently, the shifting burden of production analysis delineated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is not applicable to the FMLA dispute here. *See Liu v. Amway Corp.,* 347 F.3d 1125, 1136 (9th Cir.2003).

 To prevail on her FMLA claim, Plaintiff need only prove by a preponderance of the evidence that her taking FMLA protected leave constituted a negative factor in the decision to terminate her. *Bachelder,* 259 F.3d at 1125. In doing so, Plaintiff can proffer either direct or circumstantial evidence. *Id.* Here, however, Defendants have proffered unrebutted evidence that Plaintiff's use of FMLA protected leave did not play any role in her termination.

### 2. Analysis

First, as a result of the June 22, 2005 incident, Defendants could have sought to terminate Plaintiffs' employment immediately but instead on June 23rd placed her on administrative leave with pay in order to conduct an investigation of the matter. PSSGI Fact No. 39; Huber letter of June 23, 2005, page 498 of 7/11/07 Defendants' Appendix of Evidence. On July 8, 2005, the SCPMC and Plaintiff entered into the LCA wherein: 1) Plaintiff admitted that "the facts alleged in the Level 5 are true" which would have justified SCPMC's ter-

mination of her employment (*see* LCA at ¶ D–1); 2) in lieu of the termination, Plaintiff agreed to enroll in a chemical dependency recovery program either provided by Kaiser or approved in writing by SCPMC (*Id.* at ¶ D–2); 3) Plaintiff would not be allowed to return to work until she provided documentation to the SCPMC "that she has completed the first phase of a recovery program as determined by her continued dependency recovery program administrator" (*Id.*); 4) her continued employment with the SCPMC was "contingent upon her complying with all of the . . . terms of [the LCA], and that her failure to do so will result in immediate termination of employment" (*Id.* at ¶ D–9); and 5) the SCPMC would grant Plaintiff a "medical leave of absence to complete the first phase of a recovery program" but: a) the Plaintiff was to provide a "certification of a physician" for the medical leave; b) if a medical leave of absence was granted, the Plaintiff was to submit "an appropriate written release to return to work prior to the concluding date of the medical leave of absence"; and c) the "medical leave of absence will be subject to the same terms and conditions of any other medical leave of absence." *Id.* at ¶ D–3; *see* pages 284–89 of 7/11/07 Defendants' Appendix of Evidence.

 In light of the above, the period between June 23 and July 8 did not constitute FMLA protected leave. FMLA leave is *unpaid* unless the employee elects or an employer's existing policy requires the substitution of an employee's vacation, paid sick leave or paid personal time off. *See* 29 C.F.R. § 825.207; *also* Chin, Wiseman, Callahan & Exelrod, *California Practice Guide: Employment Litigation*

---

**14.** In her FMLA claim, Plaintiff seeks compensatory (including recovery for emotional distress) and punitive damages. However, as noted in *Farrell v Tri–County Metro. Trans.*

*District,* 530 F.3d 1023, 1025 (9th Cir.2008), emotional distress and punitive damages are *not* recoverable in FMLA cases.

(the Rutter Group 2007) §§ 12:18 and 12:935 (henceforth "Chin, *Employment Litigation*"). Here, SCPMC paid for the administrative leave and did not require Plaintiff to substitute her own paid time off for that period. *See* PSSGI Fact Nos. 39 and 40.

▮ For the period beginning after July 8, Plaintiff's absence from work could be treated as falling within FMLA. However, there is no evidence that her termination was based in any way on her having taken that FMLA leave. The SCPMC's stated reason for the termination was Plaintiff's failure to comply with the provisions of the LCA. The LCA did specifically provide for immediate termination for a failure to comply with its requirements. The Plaintiff was continually warned that a violation of the LCA would lead to the loss of her employment. *See e.g.,* Even Deposition 169:12–18 and 179:14–17, attached as Exhibit W to 7/11/07 Defendants' Appendix of Evidence at 638 and 642. In her grievances regarding the termination, Plaintiff did not raise any purported FMLA violation as a possible basis for the employer's adverse employment action. Furthermore, while "substance abuse may be a serious health condition if the conditions of [29 C.F.R. § 825.114(a) ] are met," "FMLA leave may only be taken for treatment for substance abuse by a health care provider or by a provider of health care services on referral by a health care provider." 29 C.F.R. § 825.114(d). Therefore, the mere fact that an employee may be absent because of his or her use of alcohol or a controlled substance does not qualify for FMLA leave because such leave is for the purpose of undergoing treatment by a health care provider not merely waiting to undergo such a program. *See* Chin, *Employment Litigation* § 12:281. Plaintiff argues that because she was on FMLA leave when terminated by the SCPMC, summary judgment cannot be granted. Even assuming *arguendo* that she was in a program when terminated,[15] as noted in 29 C.F.R. § 825.112(g), "treatment for substance abuse does not prevent an employer from taking employment action against an employee." Therefore, if in fact (as discussed below), the Defendants reasonably believed that Plaintiff had violated the LCA when they ended her employment on September 1, 2005, such termination would not violate the FMLA merely because she was on FMLA leave at the time.

▮ Plaintiff also argues that the Defendants violated the FMLA by: 1) failing to give her timely and adequate notice of their a) FMLA notice requirements and b) their designation of her leave as FMLA leave, and 2) retroactively designating her leave in violation of 29 C.F.R. § 825.208. These contentions are somewhat of a red herring. SCPMC terminated Plaintiff's employment. There is no evidence that SCPMC in its records improperly designated her leave as being or not being within the FMLA. If Plaintiff's termination is upheld, the matter is moot. If the termination is set aside, then perhaps the matter may have to be addressed. However, as noted in *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.,* 183 F.3d 155, 162 (2nd Cir.1999): the FMLA does not give an employee a "right to sue the employer for failing to give notice of the terms of the Act where the lack of notice had no effect on the employee's exercise or attempt to exercise any substantive right conferred by the Act."

---

**15.** Plaintiff was not in the Kaiser authorized CDRP after August 24, 2005. As of September 1, 2005, she was not enrolled in the BRN program. When asked by her employer on that date if she was enrolled in a treatment program, she responded "No." Thus, arguably, Plaintiff was not on FMLA leave at that point.

■ Plaintiff also claims that Defendants violated the FMLA by requiring her to get medical documentation from a physician to take the medical leave of absence and, if that medical leave of absence was granted, to get an appropriate written release to return to work. However, regulations under the FMLA clearly allow employers to require an employee to procure medical certification to verify the employee's serious health condition before FMLA leave is granted (29 C.F.R. § 825.305(a)), and to require medical certification that the employee is "fit for duty" before allowing the employee to return to work (29 C.F.R. § 825.310(a)). *See* Chin, *Employment Litigation* § 12.710.

In light of the above, Defendants have proffered sufficient evidence (which Plaintiff has failed to rebut) that Plaintiff's FMLA claim is untenable.

## C. *The Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing*

### 1. *Preemption*

■ In the FAC, Plaintiff's second cause of action alleges a breach of an employment contract which was "partly written, partly verbal, and partly implied." [16] FAC at ¶ 101. The written portion was embodied in an Employee handbook and in the collective bargaining agreement ("CBA") (here the Labor Agreement). *Id.* Plaintiff asserts breaches of that "employment contract" and also the LCA. Plaintiff's fourth cause of action alleges the existence of purported implied covenants of good faith and fair dealing which were also supposedly breached.[17]

■ However, as Defendants have pointed out, Section 301 of the Labor Management Relations Act (29 U.S.C. § 185(a)) completely preempts any state law contract claims based upon an employment right created or governed by a CBA. As held in *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 220, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985): "... when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, ... or dismissed as pre-empted by federal labor-contract law." The reason for the preemption of state causes of action is to: 1) ensure uniform interpretation of contractual provisions in labor agreements (*see Id.* at 211, 105 S.Ct. 1904), and 2) to assure that interpretation of the CBAs "remains firmly in the arbitral realm." *Lingle v. Norge Div. Of Magic Chef, Inc.,* 486 U.S. 399, 411, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988).

■ State law breach of contract claims are preempted if the dispute under the contract is covered by the CBA or the employee relies on the CBA in asserting the contract claim. While Plaintiff contends that the terms of the contract include the personnel policies embodied in SCPMG's Employee Handbook, the CBA, and the terms of the LCA, the subject matter of her contract claim concerns a job position that is undisputedly covered by the CBA. "Because any 'independent agreement of employment [concerning the job position] could be effective only as part

---

16. Plaintiff has not proffered any evidence as to the purported oral and implied terms of her employment contract with Defendants.

17. The exact nature of Plaintiff's breach of the implied covenant claim is ambiguous. As noted by the California Supreme Court in *Guz v. Bechtel National Inc.,* 24 Cal.4th 317, 348–53, 100 Cal.Rptr.2d 352, 8 P.3d 1089 (2000), where a plaintiff employee has sued for a breach of an employment contract based upon his or her being fired, the doctrine of the implied covenant of good faith and fair dealing is either inapplicable or superfluous because it is already covered by the breach of contract claim.

of the collective bargaining agreement,' the CBA controls and the contract claim is preempted." *Young v. Anthony's Fish Grottos, Inc.*, 830 F.2d 993, 997 (9th Cir. 1987) (citation omitted). Plaintiff's *job* was governed by a CBA, so her breach of contract claims based on the loss of that job are preempted—which is to say that they can only be considered here as claims for breach of the CBA. Similarly, the Ninth Circuit has "generally held that section 301 [of the LMRA] preempts the California state cause of action for breach of the implied covenant of good faith and fair dealing when an employee enjoys comparable job security under a collective bargaining agreement." *Milne Employees Ass'n v. Sun Carriers, Inc.*, 960 F.2d 1401, 1411 (9th Cir.1992). Accordingly, both Plaintiff's state breach of contract and breach of the implied covenant claims are preempted by Section 301.[18]

## 2. *Breach of the Duty of Fair Representation*

■■■ However, as correctly argued by the Plaintiff, state breach of contract causes of action can be brought in federal court as Section 301 claims *provided that* she alleges and proves that her union breached its duty of fair representation by refusing to take her grievances with the SCPMC to arbitration. *See* Chin, *Employment Litigation*, § 15:311. As stated in *Vaca v. Sipes*, 386 U.S. 171, 186, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967):

> ... the wrongfully discharged employee may bring an action against his employer in the face of a defense based upon the failure to exhaust contractual remedies, provided the employee can prove that the union as a bargaining agent

breached its duty to fair representation in its handling of the employee's grievance. We may assume for present purposes that such a breach of duty by the union is an unfair labor practice.... The employee's suit against the employer, however, remains a § 301 suit, and the jurisdiction of the courts is no more destroyed by the fact that the employee, as Dart and parcel of his § 301 action, finds it necessary to Drove an unfair labor practice by the union, than it is by the fact that the suit may involve an unfair labor practice by the employer himself. The court is free to determine whether the employee is barred by the actions of his union representative, and, if not, to proceed with the case. [Footnote omitted.]

Thus, before reaching the merits of Plaintiff's contract/Section 301 claims, this Court must first pass upon whether the KPNAA breached its duty of fair representation in failing to take her grievance to arbitration. *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 82, 110 S.Ct. 424, 107 L.Ed.2d 388 (1989) ("Because a plaintiff must as a matter of logic prevail on his unfair representation allegation against the union in order to excuse his failure to exhaust contractual remedies before he can litigate the merits of his § 301 claim against his employer, we found it 'obvious that the courts will be compelled to pass upon whether there has been a breach of the duty of fair representation in the context of many § 301 breach-of-contract actions.' 386 U.S. at 187, 87 S.Ct. at 915.").

■■■ "A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member

---

**18.** Plaintiff's position that her state law contract causes of action are not preempted is puzzling in light of Judge Howard Matz's October 23, 2006 Order in this action where he declined to exercise supplemental jurisdiction over any non-federal claims, remanded "all state law claims," and ordered Plaintiffs to file a First Amended Complaint which included the present breach of contract and implied covenant causes of action.

of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190, 87 S.Ct. 903. "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953), as to be irrational." *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991).

In the context of evaluating a union's refusal to proceed to arbitration on an employee's grievance, the Supreme Court has stated that:

> Though we accept the proposition that a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion, we do not agree that the individual employee has an absolute right to have his grievance taken to arbitration regardless of the provision of the applicable collective bargaining agreement.
>
> \* \* \*
>
> If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation.
>
> \* \* \*
>
> For if a union's decision that a particular grievance lacks sufficient merit to justify arbitration would constitute a breach of the duty of fair representation because a judge or jury later found the grievance meritorious, the union's incentive to settle such grievances short of arbitration would be seriously reduced. The dampening effect on the entire grievance procedure of this reduction of the union's freedom to settle claims in good faith would surely be substantial. Since the union's statutory duty of fair representation protects the individual employee from arbitrary abuses of the settlement device by providing him with recourse against both employer (in a § 301 suit) and union, this severe limitation on the power to settle grievances is neither necessary not desirable.

*Vaca*, 386 U.S. at 191–93, 87 S.Ct. 903.

In considering the issue, a deferential standard is appropriate. "Because the union must balance many collective and individual interests when it decides whether and to what extent to pursue a particular grievance, courts should accord substantial deference to the union's decisions." *Dutrisac v. Caterpillar Tractor Co.*, 749 F.2d 1270, 1273 (9th Cir.1983). "This deferential standard for arbitrary conduct 'gives the union room to make discretionary discussions and choices, even if those judgments are ultimately wrong.'" *Beck v. UFCW, Local 99*, 506 F.3d 874, 879 (9th Cir.2007), quoting *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45–46, 119 S.Ct. 292, 142 L.Ed.2d 242 (1998).

Under that standard, purported breaches of the duty of fair representation are analyzed "on a continuum" where, on one end, "acts of judgment" are accorded high deference and, on the other, mere "ministerial acts" are not. *Beck*, 506 F.3d at 879. "Under Supreme Court precedents, so long as a union exercises its judgment, no matter how mistakenly, it will not be deemed to be wholly irrational." *Id.* However, where the union in fact does not exercise any judgment/discretion or fails to perform some mere ministerial act (*e.g.*, failing to file a grievance on time), the courts will not accord deference and such action or inaction will be viewed as irrational. *Id.* Additionally, a union's exercise of judgment will be found arbitrary if

the union made that judgment in bad faith or in a discriminatory manner. *Id.* at 880. However, "[t]o establish that the exercise of judgment was discriminatory, a plaintiff must adduce 'substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives.' *Amalgamated Ass'n of St. Elc. Ry. & Motor Coach Employees of Am. v. Lockridge,* 403 U.S. 274, 301, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971)." *Id.* "To establish that the union's exercise of judgment was in bad faith, a plaintiff must show 'substantial evidence of fraud, deceitful action or dishonest conduct.' *Lockridge,* 403 U.S. at 299, 91 S.Ct. 1909." *Id.*

 Here, it is not disputed that the KPNAA helped Plaintiff grieve her discharge through Steps Two and Three as provided for in the Labor Agreement.[19] PSSGI Fact Nos. 78, 81 and 83. At the Step Three meeting on November 7, 2005,

both Even (Plaintiff's union representative) and Joe Kaplon (KPNAA's attorney) attended and supported Plaintiff's position. PSSGI Fact Nos. 83 and 84. After the Step Three meeting, Kaplon asked Plaintiff to provide the union with copies of her medical records and six references for purposes of another meeting at which time the union would decide if it would proceed to arbitration in her matter.[20] PSSGI Fact No. 86.

On January 27, 2006, the KPNAA sent Plaintiff a letter informing her that, after conducting its own investigation and evaluation of her case, the union had decided not to proceed to arbitration with her grievance. PSSGI Fact No. 88.[21] Plaintiff did not contact Even or Kaplon after receiving the January 27, 2006 letter. PSSGI Fact No. 89.

Plaintiff did file an unfair labor practice charge against the KPNAA claiming that

---

**19.** Because Plaintiff was discharged, grievances based on termination are referred immediately to Step Two pursuant to paragraph 1207 of the Labor Agreement. *See* page 407 of 7/11/07 Defendants' Appendix of Evidence.

**20.** Plaintiff testified in her April 17, 2007 deposition that during the post Step Three meeting discussion between herself and Kaplon, he told her that Ramah Baliber (SCPMC's Senior Labor Relations Representative at the Step Three meeting) had said to him that Plaintiff "was a problem at Woodland Hills also. And that they only offered me the Last Chance Agreement because they though I had cancer. And now that I don't have cancer, they don't want me back. In those words." *See* PSSGI Fact No. 85. Assuming one can overcome the foundation and hearsay problems in regards to the purported statement, that evidence is not germane to the issues herein. The Plaintiff agreed that "the facts alleged in the Level 5 are true" which would have resulted in her discharge but for the Last Chance Agreement which provided for her immediate termination in the event of her failure to comply with its terms. The assertion that the SCPMC gave her that last chance, rather than immediately firing her, because it thought she had cancer does not raise either: 1) an instance of

improper discrimination as to the Plaintiff, or 2) a material issue regarding whether the KPNAA breach its duty of fair representation or whether the Plaintiff failed to comply with the terms of the LCA.

**21.** In her response to Defendants' Alleged Uncontroverted Fact No. 88, Plaintiff states that she controverts it "in part, as incomplete and conclusory." *See* PSSGI Fact No. 88. However, Plaintiff offers no evidence to rebut the Defendants' contention that before deciding not to proceed to arbitration with Plaintiff's grievance, the KPNAA had conducted its own investigation and evaluation. Moreover, Plaintiff asserts that "the union admitted it [sic] reasons for not pursuing the grievance were discriminatory." *Id.* Plaintiff does not delineate what the purported discriminatory reasons are. Additionally, the evidentiary citations proffered by Plaintiff do not provide any proof of some discriminatory reason let alone constitute *"substantial* evidence of discrimination that is intentional, severe, and unrelated to legitimate union activities [emphasis added]." *Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Employees of Am.,* 403 U.S. at 301, 91 S.Ct. 1909.

the union had "failed to represent the Charging Party by failing to arbitrate her grievance." *See* page 565 of 7/11/07 Defendants' Appendix of Evidence. In denying her charge, the NLRB Region 31 noted that the union had investigated Plaintiff's matter and determined that her conduct constituted a number of violations of the LCA and, as a result, "it would be unsuccessful if [her] case was pursued in arbitration." *Id.* at 567. It was further concluded that, "the evidence is insufficient that the Union's decision was motivated by any consideration that is unlawful under the National Labor Relations Act." *Id.*

It cannot be disputed that the KPNAA's decision in regards to whether to proceed to arbitration on Plaintiff's grievance was a situation requiring the exercise of judgment/discretion and not a mere ministerial act. Moreover, there is no evidence to suggest that the KPNAA, in fact, did not exercise its judgment or did so in a purely perfunctory manner. Consequently, this Court must accord deference to that deter-

mination. While Plaintiff claims that the KPNAA acted with discriminatory reasons, she has failed to articulate what those discriminatory reasons are or to proffer any substantial evidence to support her assertion.[22] Therefore, this Court finds that there is no material issue of fact in dispute and that the Defendants are entitled to summary judgment on the issue of whether the KPNAA breached its duty to fairly represent the Plaintiff. Moreover, because this Court finds no breach of that duty, Defendants are also entitled to summary judgment as to Plaintiff's contractual causes of action.

### D. The FLSA Claim

#### 1. Applicable Law

Plaintiff's fifth and final cause of action alleges a purported failure to pay overtime and other wages in violation of the FLSA.[23] Defendants move for summary judgment on this cause of action asserting that Plaintiff falls within an exemption under the FLSA and hence is not entitled to any such additional wages.[24]

**22.** Plaintiff also contends that she made complaints to the KPNAA about issues in this lawsuit which the union failed to pursue without deliberations, explanation and/or for discriminatory reasons. However, again, Plaintiff fails to delineate what those issues actually are, fails to proffer any evidence to support her assertion, raises assertions which are already subsumed by the termination issue, and raises contentions which are insufficient as a matter of law. For example, Plaintiff argues that regardless of the terms of the LCA, even if she was not in compliance with the terms of the LCA, because such non-compliance was due to (or was a symptom of) her alcoholism, Defendants were obligated to further accommodate her or to give her another chance. However, as noted in such cases as *Fuller v. Frank,* 916 F.2d 558, 562 (9th Cir.1990), where an employee with an alcohol problem has been provided with a last chance agreement and given time plus assistance in locating a treatment program, the employer is "not required to provide [the employee] with

another chance after having given him a 'last chance.' [Footnote omitted]."

**23.** Although the Defendants have raised the failure to exhaust as an affirmative defense, they have not moved for summary judgment on Plaintiff's FLSA claim for failure to exhaust the grievance provisions of the Labor Agreement. *See Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 987–88 (9th Cir.2007). As provided in paragraph 1202 of the Labor Agreement, the grievance procedures cover "any dispute arising between the parties concerning ... any disagreement relating to wages...." *See* page 406 of 7/11/07 Defendants' Appendix of Evidence.

**24.** Plaintiff argues that Defendants did not timely plead exemption as an affirmative defense and hence should be barred from raising it. However, in Defendants SCPMC and Weisz's First Amended Answer filed on November 6, 2006, in the Seventeenth Affirmative Defense on page 21, Defendants assert that "Plaintiff was exempt from the overtime

■ Employees who work in a "bona fide executive, administrative, or professional capacity" are excluded from the FLSA's overtime requirement. *See* 29 U.S.C. § 213(a)(1). As the Ninth Circuit explained in *Boykin v. Boeing Co.*, 128 F.3d 1279, 1281 (9th Cir.1997), "The Act does not define 'executive, administrative, or professional;' rather, it grants the Secretary of Labor broad authority to 'define and delimit' these terms." *Id.*, citing *Auer v. Robbins*, 519 U.S. 452, 456, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). "Under the Department of Labor's (DOL) definitions, an employee qualifies for exempt status if the employee performs certain duties and is compensated on a genuine salary basis. [citations]." *Id.* Specifically, 29 C.F.R. 541.300 provides in part:

> The term "employee employed in a bona fide professional capacity" in section 13(a)(1) of the Act shall mean any employee:
>
> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week ... exclusive of board, lodging, or other facilities; and
>
> (2) Whose primary duty is the performance of work:
>
> (i) Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction[.]

Thus, an employee qualifies as an exempt learned professional if her primary duties require advanced knowledge customarily acquired by a prolonged course of specialized instruction and she is compensated at a rate of at least $455 a week. Defendants argue that CRNAs (like Plaintiff) satisfied both tests.

■ Because the FLSA "is to be liberally construed to apply to the furthest reaches consistent with Congressional direction ... FLSA exemptions are to be narrowly construed against ... employers and are to be withheld except as to persons plainly and unmistakenly within their terms and spirit." *Klem v. County of Santa Clara*, 208 F.3d 1085, 1089 (9th Cir. 2000) (internal quotation marks and citations omitted); *see also Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1124–25 (9th Cir.2002). "The criteria provided by regulations are absolute and the employer must prove that any particular employee meets every requirement before the employee will be deprived of the protection of the Act." *Mitchell v. Williams*, 420 F.2d 67, 69 (8th Cir.1969).

### 2. *The "Duties" Requirement*

It is not disputed that CRNAs in California are registered nurses who have received years of additional training and have been certified to provide anesthesia services. *See* California Bus. & Prof.Code §§ 2825 *et seq.* Therefore, they clearly satisfy 29 C.F.R. § 541.300(a)(2)'s criterion of "requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction". Indeed, as provided in 29 C.F.R. § 541.301(e)(2), registered nurses themselves (who have not had the additional training of CRNAs) "who are registered by the appropriate State examining board generally meet the duties requirements for the learned professional exemption." Given that CRNAs have even more years of medical training than registered nurses, it cannot be seriously contested that CRNAs

---

requirements ... Plaintiff was employed in an administrative, executive and/or professional capacity...." Moreover, even if the Defendants had not raised exemption as an affirmative defense, in *Camarillo v. McCarthy*, 998

F.2d 638, 639 (9th Cir.1993), it was held that, absent a showing of prejudice, an affirmative defense may be raised for the first time at summary judgment.

fail to meet the regulatory definition of a "professional."

■■■ Plaintiff argues that CRNAs employed by Defendants are not professionals because their work does not require "the consistent exercise of discretion and judgment" as necessitated in 29 C.F.R. § 541.301(b), and CRNAs work under the immediate supervision of anesthesiologists or other physicians. Those contentions fail for a number of reasons. First, as stated in Section 541.301(b) itself, "An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances." Second, Section 541.301(b)'s reference is to the "consistent exercise of discretion" not to the "constant" exercise of discretion. What the regulation is distinguishing is the "professional" who in the course of his or her job must make judgments based upon advanced knowledge as opposed to a "non-professional" who simply performs "routine mental, manual, mechanical or physical work." *Id.* Third, the undisputed evidence (especially Plaintiff's own deposition testimony) clearly establish that the CRNA's position with the SCPMC requires the consistent exercise of discretion. Fourth, the mere fact that CRNAs work under the supervision of anesthesiologists and/or other physicians does not vitiate their professional status. Indeed, registered nurses who are recognized as professionals in the regulations similarly work under the supervision of doctors. Further, "active supervision" does not negate an employee's exercise of discretion and judgment. *Cf. Murray v. Stuckey's, Inc.,* 50 F.3d 564, 570 (8th Cir.1995) ("[A]ctive supervision and periodic visits by a regional manager do not eliminate the day-to-day discretion of the on-site store manager.").

Finally, Defendants have cited Opinion Letter No. 1901 (February 19, 1998) from the Department of Labor, Wage and Hour Administrator for the proposition that CRNAs qualify as exempt professional employees.[25] *See* 1998 DOLWH LEXIS 16. A better reference is to a December 29, 1999 Opinion Letter from the Department of Labor Wage and Hour Division, 1999 DOLWH LEXIS 127, which states:

> ... the CRNA is an advance practice nurse who administers anesthesia. They care for patients before, during and after surgery or procedures which require the use of anesthetic agents. CRNA's are required to possess both a registered nurse license and a Bachelor of Science degree in nursing program. During their course of study, students are required to participate in a variety of cases and anesthetic techniques. Graduates of a program must then pass a national certification exam to become certified as a CRNA. CRNA's must then be re-certified every two years to maintain their license.

> The routine duties of a CRNA include: providing a nursing assessment of the patient's health; determining in consultation with the anesthesiologist or operating physician and administering the appropriate anesthesia plan; taking corrective action to counteract problems that may develop during the implementation of the anesthesia plan; providing necessary post operative care; and providing other service as deemed necessary by the anesthesiologist or operating physician.

* * *

---

**25.** The degree of deference which a court should accord to a Department of Labor opinion letter will vary depending on the circumstances. *See Bassiri v. Xerox Corp.,* 463 F.3d 927, 930–31 (9th Cir.2006).

The exercise of discretion and independent judgement, in general, involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after various possibilities have been considered. The term implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance. An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether an object falls into one or another of a number of definite grades, classes, or other categories is not exercising discretion and independent judgement within the meaning of section 541.3, even if there is some leeway in reaching a conclusion.

Based on the information you have provided we conclude that the position of Certified Registered Nurse Anesthetist meets the professional exemption under 541.3. Although they work under the direction of an attending physician who is ultimately responsible for the patient's care, their routine duties appear to satisfy the regulatory criteria.

In light of the above, CRNAs clearly meet the "duties" requirement of 29 C.F.R. § 541.300(a).

### 3. *The Salary Basis Requirement*

█ The "salary basis" requirement for professional employees in 29 C.F.R. § 541.300(a) is defined in 29 C.F.R. § 541.602. *See* 29 C.F.R. § 541.300(b). As stated in Section 541.602(a):

*General rule.* An employee will be considered to be paid on a "salary basis" within the meaning of these regulations if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. Subject to the exceptions provided in paragraph (b) of this section, an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked. Exempt employees need not be paid for any workweek in which they perform no work. An employee is not paid on a salary oasis if deductions from the employee's predetermined compensation are made for absences occasioned by the employer or by the operating requirements of the business.

The mere fact that an employer may have made an improper deduction to an exempt employee's salary does not mean that the exemption is automatically loss. As provided in 29 C.F.R. § 541.603:

(a) An employer who makes improper deductions from salary shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis. An *actual practice* of making improper deductions demonstrates that the employer did not intend to pay employees on a salary basis. The factors to consider when determining whether an employer has an actual practice of making improper deductions include, but are not limited to: the number of improper deductions, particularly as compared to the number of employee infractions warranting discipline; the time period during which the employer made improper deductions; the number and geographic location of employees whose salary was improperly reduced; the number and geographic location of managers responsible for taking the improper deductions; and whether the employer has a clearly com-

municated policy permitting or prohibiting improper deductions.

\*　　\*　　\*　　\*　　\*　　\*

(c) Improper deductions that are either isolated or inadvertent will *not* result in loss of the exemption for any employees subject to such improper deductions, if the employer reimburses the employees for such improper deductions.

(d) If an employer has a clearly communicated policy that prohibits the improper pay deductions specified in § 541.602(a) and includes a complaint mechanism, reimburses employees for any improper deductions and makes a good faith commitment to comply in the future, such employer will not lose the exemption for any employees unless the employer willfully violates the policy by continuing to make improper deductions *after* receiving employee complaints. If an employer fails to reimburse employees for any improper deductions or continues to make improper deductions after receiving employee complaints, the exemption is lost during the time period in which the improper deductions were made for employees in the same job classification working for the same managers responsible for the actual improper deductions. The best evidence of a clearly communicated policy is a written policy that was distributed to employees prior to the improper pay deductions by, for example, providing a copy of the policy to employees at the time of hire, publishing the policy in an employee handbook or publishing the policy on the employer's Intranet.

(e) *This section shall not be construed in any unduly technical manner as to defeat the exemption.* [Emphasis added.]

Defendants established through the Labor Agreement and the Declaration of Rosanne Padovich plus concomitant Exhibits G through J of 7/11/07 Defendants' Appendix of Evidence that Plaintiff was paid a salary every two weeks based upon "80 hours of pay" in amounts exceeding the $455 per week minimum set in 29 C.F.R. § 541.300(a)(1). Plaintiff has offered six arguments—but not any evidence—to rebut Defendants' showing. Those six arguments do not demonstrate that the salary requirement has not been satisfied in this case.

First, Plaintiff cites to language in paragraph 802 of the Labor Agreement (*see* page 403 of the 7/11/07 Defendants' Appendix of Evidence) which states: "However, if an employee is off work on a non-compensated employee initiated absence, the employee is not guaranteed eighty (80) hours of pay." Plaintiff contends that "this provision plainly subjects employees to improper deductions of partial days and/or days ..." *See* PSSGI Fact No. 19. Contrary to Plaintiff's contention, the quoted portion of paragraph 802 does not concern deductions at all. It simply provides that if a CRNA elects on his or her own initiative to be absent from work on a basis where the employee is not entitled to compensation, then the *guaranty* of 80 hours of pay for that period is not applicable. Further, Plaintiff testified that, prior to the June 22, 2005 incident, she never took any unpaid leave. *See* page 10 of 8/13/07 Defendants' Appendix of Evidence.

Second, Plaintiff claims that she was subject to deductions in pay for less than one day and/or on a basis other than a "daily rate". *See* pages 19–21 of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Opposition"). As noted in *Abshire v. County of Kern,* 908 F.2d 483, 486 (9th Cir.1990), "In order to satisfy the salary test, an employee's pay cannot be subject to deductions for absences of less than a day." In support of her contentions, Plaintiff cites to portions of her payroll documentation as main-

tained by SCPMC and her paycheck stubs (attached as Exhibits I and J to the 7/11/07 Defendants' Appendix of Evidence) as proof that the SCPMC deducted from her paychecks periods of time less than a full day and/or on a basis other than a "daily rate". For example, Plaintiff contends that she was "paid less than 80 hours on multiple occasions, including pay periods ending (1) December 8, 2002 (70 hours), (2) November 10, 2002 (71.5 hours) . . ." apparently referencing the box in the paystubs for "units/hrs". *See* Southern California Permanente Medical Group's Statement of Genuine Issues in Support of Its Opposition to Plaintiff's Motion for Summary Judgment at Fact No. 492, which presumably in turn is citing to Exhibit J in 7/11/07 Defendants' Appendix of Evidence at pages 123 and 126. The entries in those boxes do show numbers which are less than 80. However, Plaintiff has presented no evidence to indicate that if the number shown is less than 80, then in fact a *deduction* had been made by the SCPMC.[26] The only evidence on this issue is in paragraphs 20 and 25 of the Declaration of Rosanne Padovich (pages 27–29 of 7/11/07 Defendants' Appendix of Evidence), which contradict Plaintiff's argument and states:

> 20. * * * * On her pay stub, it shows regular time worked. If she worked less than 80 hours (*e.g.*, 72 hours), there was no separate line item indication for the guaranteed rate that would pay out the extra hours (*e.g.*, 8 hours) to bring to a total of 80 hours every two weeks. However, the guarantee would be calculated and added into the paycheck even though there was no separate line item for it. Shift differentials and any applicable guarantee were processed in the same step, which is when I hit "F2" in the payroll program. As such, when

line items for evening and night shift differentials appeared on Ms. Cavanaugh's paycheck, it necessarily followed that the guarantee was included as well if she did not work 80 regular hours.

\* \* \* \* \* \*

25. Vacation and/or personal pay is reflected on the pay stubs as PTO. When Ms. Cavanaugh was eligible for vacation as a benefited employee, any time she took would be reflected on her pay stub. When Ms. Cavanaugh participated in the Alternative Compensation Program, she was not eligible for vacation and no PTO would be reflected in her pay stub. However, if she took a day off, it was reflected in SCPMG's records, even though she would not be paid for it. For example, Ms. Cavanaugh's pay stub for pay period ending 11–10–2002 reflects 71.50 regular hours worked. However, in SCPMG's records, under personal time off, there is an entry for 8.50 hours of personal time taken 11–1–2002 (during the pay period ending 11–10–2002). Ms. Cavanaugh was not paid for this time off because she was a voluntary participant in the Alternative Compensation Program.

Moreover, where the figure in the "unit/hrs" box is not divisible by the number 8 does not mean that a deduction of less than a day has occurred. For example, when Plaintiff worked additional shifts, she was compensated on an hourly basis for that additional time. *See* paragraphs 18–19 of Padovich Declaration, page 27 of 7/11/07 Defendants' Appendix of Evidence. Also, certain shifts would contain a total number of hours which were less than 8 while others would have more than 8. *See* Exhibit G on page 30 of 7/11/07 Defendants' Appendix of Evidence; *also* para-

---

**26.** Plaintiff did not submit any declaration or deposition transcript to support her conten-

tion/interpretation of the entries on the paystubs.

graph 802 of the Labor Agreement which provides that "While each full-time employee will be scheduled to work an average of eighty (80) hours biweekly, the actual daily and weekly work schedule may vary due to time requirements of specific assignments and seasonal variations in work load." *Id.* at page 403.

Third, Plaintiff contends that the Defendants deducted for absences which were "occasioned" by the employer in violation of 29 C.F.R. § 541.602. The only instances of such deduction referenced by Plaintiff were: 1) the requirement that CRNAs participating in the ACP take two weeks of unpaid leave per calendar year, and 2) Plaintiff's not being paid on June 22, 2005. Neither situation nullifies the salary element herein. The two week unpaid leave requirement is only applicable to employees who elect to participate in the ACP program where CRNAs agree to give up such benefit as: 1) the SCPMC's paid health and dental plans, 2) the accrual of earned time off, 3) education leave in exchange for receiving a twenty percent increase in their compensation rate. However, while participants in the ACP do not earn paid time off, they are required to take unpaid time amounting to two weeks off per years "to accomplish the rest and relaxation provided to other employees via Earned Time off." *See* page 48 of the Labor Agreement, 7/11/07 Defendants' Appendix of Evidence at page 423. CRNAs are paid a basic salary depending on the step level they are in. *Id.* at page 421–22. When the CRNAs in the ACP take their two week leave, their base salary is not reduced as a consequence. Thus, there is no deduction in base salary.

As to the non-payment for June 22, 2005, the SCPMC did not pay Plaintiff for that day because she arrived at work in an apparent inebriated state as she admitted in the LCA. 29 C.F.R. § 541.602(b)(5) provides that "Deductions from pay of exempt employment may be made for unpaid disci-

plinary suspension of one or more full days imposed in good faith for infractions of workplace conduct rules."

Fourth, Plaintiff asserts that because participants in the ACP were not provided with any plan or policy to provide any compensation for leave due to disability or sickness, deductions in pay for sick time from Plaintiff were improper by themselves and were improper because they were based on missed hours rather than missed days. Plaintiff is incorrect as to their being no plan in regards to sick leave. As stated in the Labor Agreement at page 49, in exchange for the twenty percent increase in compensation:

> CRNAs participating in the ACP will have their current Extended Sick Leave Bank frozen upon entering the Program. Extended Sick Leave already accrued at the time of transfer to the ACP will be available when the CRNA returns to the regular compensation program. No additional Extended Sick Leave will accrue while in the ACP.

*See* 7/11/07 Defendants' Appendix of Evidence at page 423. As provided in 29 C.F.R. § 541.602(b)(2), "Deductions from pay may be made for absences of one or more full days occasional by sickness or disability ... if the deduction is made in accordance with a bona fide plan, policy or practice of providing compensation for loss of salary occasioned by such sickness or disability." Where the Labor Agreement provides for the ACP which pays a participating CRNA twenty percent more in compensation in exchange for waiving such benefits as paid sick leave, the ACP can be considered a plan, policy or practice under Section 541.602(b)(2). Further, while Plaintiff claims that she suffered sick time "deductions [that] were based on hours missed" rather than on full days (*see* Plaintiff's Opposition at page 21), she fails to

cite to any evidence in the record to support that proposition.

Fifth, Plaintiff asserts that the SCPMC violated 29 C.F.R § 541.602(a)(3) which provides:

> While an employer cannot make deductions from pay for absences of an exempt employee occasioned by jury duty, attendance as a witness or temporary military leave, the employer can offset any amounts received by an employee as jury fees, witness fees or military pay for a particular week against the salary due for that particular week without loss of the exemption.

Plaintiff points out that paragraph 1620 of the Labor Agreement for the October 2000 to October 2005 period did allow for paid jury service but contained the following limitation: "An employee shall be eligible for a maximum often (10) days of jury duty pay once during a calendar year." *See* page 412 of 7/11/07 Defendants' Appendix of Evidence. However, as also recognized by Plaintiff, in October of 2005, "a new CBA was agreed upon and the jury duty policy was changed to exclude this cap on jury duty pay." *See* page 22 of Plaintiff Eileen Cavanaugh's Notice of Motion and Motion for Summary Judgment filed on July 11, 2007. The problem with Plaintiff's contention is that, apparently, neither Plaintiff nor any other CRNA in the SCPMC's Anesthesia Department ever had their pay deducted for jury duty service in excess often days. *See* page 2 of Declaration of Rosanne Padovich, page 109 of Appendix of Evidence in Support of Southern California Permanent Medical Group's Opposition to Plaintiff's Motion for Summary Judgment filed on August 6, 2007. The fact that the former language in paragraph 1620 indicated that a CRNA "shall be eligible for a *maximum* of ten (10) days of jury duty pay once during a calendar year [emphasis added]" did not preclude the SCPMC from allowing further jury duty pay after the original ten days had expired. Moreover, as stated in 29 C.F.R. § 541.603(b), an exemption is deemed lost where "the facts demonstrate that the employer has an *actual* practice of making improper deductions [emphasis added]...." *See generally Stanley v. City of Tracy,* 120 F.3d 179, 183–85 (9th Cir. 1997). Here, there is no evidence that Defendants had an *actual* practice of not paying for jury service in excess often days or that former paragraph 1620 demonstrates that the SCPMC did not intend to pay CRNAs on a salary basis. *See* 29 C.F.R. § 541.603(a).

Sixth, Plaintiff argues that her overtime pay bore no reasonable relationship to a "base amount". However, as noted in 29 C.F.R. § 541.604(a):

> An employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis.

> \*　　\*　　\*

> Similarly, the exemption is not lost if an exempt employee who is guaranteed at least $455 each week paid on a salary basis also receives additional compensation based on hours worked for work beyond the normal workweek. Such additional compensation may be paid on any basis (*e.g.,* flat sum, bonus payment, straight-time hourly amount, time and one-half or any other basis), and may include paid time off.

Thus, paying Plaintiff for working additional shifts or overtime on a basis other than a "base amount" does not adversely impact her exempt status.

In light of the above, the Court finds that the Plaintiff has not rebutted the evidence that Plaintiff was paid on a salary

basis.[27] Because both the duties and salary requirements are met, the Court finds Plaintiff is a professional under 29 C.F.R. § 541.300 and hence exempt from the coverage of the FLSA.

### E. *Plaintiff's Motion for Summary Judgment and/or Partial Summary Judgment and/or to Deem Matters Admitted*

Plaintiff's Motion for Summary Judgment and/or Partial Summary Judgment and/or to Deem Matters Admitted ("Plaintiff's Motion") seeks a judgment as to all four of her remaining causes of action against the Defendants and/or alternatively partial summary judgment as to ten issues. Plaintiff's Motion is defective for a number of reasons.

As to the motion for summary judgment, Plaintiff's opening memorandum includes a five page "Summary of Facts" which contains no citations to any evidentiary material or to the Plaintiff's separately filed [Proposed] Statement of Uncontroverted Facts and Conclusions of Law ("PSUF"). *See* Plaintiff's Motion at pages 2–7. As observed in *Schneider v. TRW, Inc.*, 938 F.2d 986, 990–91, fn. 2 (9th Cir.1991), " . . . the law of this circuit . . . recognizes that a district court is under no obligation to mine the full record for issues of triable fact." Likewise, the PSUF consists of 499 purported "Proposed Uncontroverted Facts" ("PUFs"). The first 104 of the PUFs are not actual proposed fats but are arguments based on discovery issues. *See, e.g.*, PUF No. 84, PSUF at page 36 ("Defendant admitted (by failing to deny) that 'Plaintiff was not paid for June 22, 2005.' ").

Plaintiff's Motion includes and to some degree rests upon her seeking to have her Request for Admissions, Set One (*see* Exhibit E to Amended Declaration of I. Benjamin Blady in Support of Plaintiff Eileen Cavanaugh's Motion for Summary Judgment filed on July 12, 2007) be deemed admitted on the ground that Defendants' responses (*see Id.* Exhibit F) were "evasive". Plaintiff's application is denied. Defendants did respond to each of Plaintiff's 133 RFAs in her Set One. Defendants' responses consisted of simple answers, objections, answers combined with explanations, and combinations of those types of replies. Where a party has in fact responded to a set of RFAs, the propounding litigant who is dissatisfied with the responses "may move to determine the sufficiency of the answer or objections." Fed.R.Civ.P. 36(a). That motion is treated as one to compel discovery. *See* Fed. R.Civ.P. 37(a)(2). "The motion must include a certification that the movant has in good faith conferred or attempted to confer with the party not making the disclosure in an effort to secure the disclosure without court action." *Id.* Plaintiff's Motion contains no certification. Furthermore, Plaintiff did not include in her Motion to Deem Matters Admitted any "Joint Stipulation" as required in L.R. 37–2.1 of the Local Rules—United States District Court, Central District of California ("Local Rules"). Under Local Rule 32–2.4, the failure to provide a Joint Stipulation and/or a Fed.R.Civ.P. 37(a)(2) certification will result in the court's refusal to consider any such discovery motion. Finally, even if this Court were to consider Plaintiff's contention that Defendants' responses to

---

**27.** Moreover, Plaintiff did not present any evidence that she ever brought to the SCPMC's attention through the grievance procedure in the Labor Agreement that she felt that the SCPMC had deducted some amount from her paycheck that was improper under the FLSA or it concomitant regulations. Therefore, even assuming arguendo that some improper deduction was made, that would not necessarily mean that the "professional" status exemption was lost. *See* 29 C.F.R. § 541.603.

the RFAs were evasive and were to find that some of them were inadequate, as noted in *Asea, Inc. v. Southern Pac. Transp. Co.*, 669 F.2d 1242, 1247 (9th Cir. 1981), "... the district court should ordinarily first order an amended answer, and deem the matter admitted only if a sufficient answer is not timely filed...." In light of the above, this Court denies Plaintiff's motion to have her RFA Set One deemed admitted, and Plaintiff's reliance on those admissions for purposes of the present motions must be rejected.

As to the substantive issues raised in Plaintiff's Motion, this Court has already ruled upon those matters in dealing with Defendants' Summary Judgment Motion.

## IV. *CONCLUSION*

For the reasons stated above, Defendants' Motion for Summary Judgment is granted. Plaintiff's Motion for Summary Judgment, Partial Summary Judgment and Motion to Deem Matters Admitted is denied.

## V. *EVIDENTIARY RULINGS*

### A. *Plaintiff's Evidentiary Objections in Opposition to Defendants' Motion for Summary Judgment*

NOONER DECL.

1. Overrule
2. Overrule

BRAGANZA DECL.

3. Overrule
4. Overrule objection to entire statement (Ex. B) as overbroad. The fact that witness does not have personal knowledge of some of the contents is not a reason to strike the entire statement. The Court will strike the sentence: "She had struck Ms. Groschen and then climbed from the head part of the gurney."

GROSCHEN DECL.

5. Overrule

6. Overrule—the objection is overbroad for the reason stated as to No. 4, above.

7. Overrule

MARCUS DECL.

8. Overrule

PADOVICH DECL.

(Note FRE 1002 objections are not well taken because the Labor Agreement is in evidence).

9. Overrule
10. Overrule
11. Overrule
12. Overrule
13. Overrule
14. Overrule
15. Overrule
16. Overrule
17. Overrule
18. Overrule
19. Overrule
20. Overrule
21. Overrule
22. Overrule
23. Overrule

EVEN. DECL.

24. Overrule

HERZBERGER DECL.

25. Overrule (Overbroad)
26. Overrule (Overbroad)

The remaining objections (27–100), although characterized as "Objections to Evidence Cited in Defendants' Statement of Uncontroverted Facts," are directed at items in Defendants' Statement of Uncontroverted Facts rather than to the underlying evidence. These are not proper objections.

**B. Plaintiff's Evidentiary Objections in Reply to Defendants' Opposition to Plaintiff's Motion**

1. Overrule
2. Overrule
3. Overrule

The remaining objections (4 through 48) go to factual assertions in Defendant's Statement of Uncontroverted Facts rather than to the underlying evidence. These are not proper objections.

**C. Defendants' Evidentiary Objections to the Second Amended Declaration of I. Benjamin Blady**

Blady's original declaration referred to portions of a deposition "which was not yet available at the time of our original filing." Blady's characterizations of the deposition testimony (which has now—except for the portion referred to at ¶ 10—apparently been attached to the amended Blady declaration) are superfluous. Defendants' objections will be sustained, except that any citations to the stricken portions of the Blady Declaration will be treated as citations to the corresponding deposition pages.